UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| QUARTZ HEALTH SOLUTIONS, INC.<br>2650 Novation Parkway<br>Madison, WI 53713<br>      Plaintiff,<br><br> -against-<br><br>MEDIMPACT HEALTHCARE SYSTEMS, INC.<br>10181 Scripps Gateway Ct.<br>San Diego, CA 92131<br>      Defendant. | Civil Action No.  3:22-cv-00633<br><br>**COMPLAINT** |

   Plaintiff, Quartz Health Solutions, Inc. ("Quartz"), brings this action against Defendant MedImpact Healthcare Systems, Inc. ("MedImpact"), seeking relief as follows:

**PARTIES**

   1. Quartz, a Wisconsin corporation with its principal place of business in the State of Wisconsin, is a health plan management services organization for its affiliated insurance companies, health maintenance, and other health care organizations.  Quartz also works as a third-party administrator with organizations, self-funded employers, and plan sponsors whereby it contracts to manage and administer health plans and to handle member claims for benefits.  Through its health plan management and administrative services, Quartz offers community-based health care to over 340,000 customers in Wisconsin, Illinois, Iowa, and Minnesota.

   2. MedImpact is a California corporation with its principal place of business in the State of California.  As a pharmacy benefits manager ("PBM"), it administers and manages prescription drug benefits for health plans—including those provided by Quartz.  MedImpact's services include establishing and maintaining retail and specialty pharmacy networks, processing prescription drug claims, and negotiating with pharmaceutical manufacturers for rebate payments.

PBMs, like MedImpact, control the delivery and cost of prescription drugs for a health plan, serving as the intermediary between the health plan, the pharmacies dispensing drugs to the health plan's members, and the pharmaceutical manufacturers providing rebates and other financial incentives for purchase of their medication. MedImpact advertises itself as the largest privately held PBM in the United States, serving over fifty-five million consumers.

## JURISDICTION AND VENUE

3. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the dispute is between citizens of different states and because the amount in controversy exceeds $75,000.

4. This Court has personal jurisdiction over MedImpact pursuant to Wisconsin's long-arm statute, Wis. Stat. § 801.05, because MedImpact engages in substantial business activities within this judicial district. The conduct complained of, and resulting injuries, are also located within this judicial district. Additionally, MedImpact consented to the jurisdiction of this Court in the 2022 Agreements ("the Agreements") that form the basis of the dispute.

5. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district. *See* 28 U.S.C. § 1391(b)(2).

6. This Court is an appropriate forum because both the Agreements and the Commercial Arbitration Rules of the American Arbitration Association provide for preliminary injunctive relief, issued by a court of competent jurisdiction, to preserve the *status quo* pending the completion of arbitration.

**FACTUAL BACKGROUND**

**I.     Quartz's Relationship with MedImpact & the Competitive Bidding Process**

7. Quartz's relationship with MedImpact began in June of 2018, when the company executed an agreement ("2019 Agreement") to serve as Quartz's PBM. Under the terms of the agreement, MedImpact would provide services as a PBM for calendar years 2019, 2020, and 2021.

8. PBMs are third-party administrators of prescription drug programs. Their primary responsibility is to handle the processing and payment of prescription drug claims on behalf of health plan management service organizations like Quartz. In addition, PBMs negotiate discounts and rebates with drug manufacturers, contract with pharmacies, and develop and maintain the list of medications covered by a particular pharmacy (known as a drug formulary). Health plan management service organizations may also task PBMs with establishing programs designed to help members maintain or improve their overall health by working with members and doctors to ensure prescribed medications are safe and effective.

9. With the 2019 Agreement set to expire at the end of 2021, Quartz began considering successor PBMs. To that end, Quartz retained the consulting firm Pharmaceutical Strategies Group ("PSG") to assist in preparing a Request for Proposals ("RFP") and coordinating the procurement. PSG published Quartz's RFP on July 13, 2020.

10. PSG included six bidders in the process, each of which it had pre-qualified to participate. One PBM declined participation in the procurement resulting in five bidders being fully evaluated.

11. Quartz expressly stated its desire for a PBM that offers competitive program pricing, full disclosure of PBM revenue streams, and ability to meet transparent contract terms, including performance guarantees.

12. Because MedImpact was Quartz's incumbent PBM, PSG requested pharmacy claims data from MedImpact to provide to all PBM bidders with a complete data set of all of Quartz's adjudicated pharmacy claims from June 1, 2019 through May 31, 2020. The 2019 Agreement required that MedImpact maintain documentation of claims processed for six years. Thus, at the time of the 2020 procurement, MedImpact had—or should have had—data reflecting claims processed for at least the preceding eighteen months.

13. MedImpact provided the claims data on June 18, 2020. It is standard practice for incumbent PBMs to provide such data.

14. The claims data received from MedImpact included names of drugs, dispensing pharmacy, fill date, drug quantity and supply, brand, and claim type. The original Quartz claims data set provided by MedImpact also included other information that is either confidential or proprietary and that could not be disclosed to third parties. After removing the confidential and proprietary information, PSG aggregated the Quartz claims data into files that were provided to the bidders along with the RFP. Although PSG advised bidders that they could analyze the data to formulate their responses to the RFP, it did not require bidders to submit proposals based on the provided claims data. Proposals were due by August 12, 2020.

15. The RFP required, among other things, that bidders address strategic, business, and financial requirements, and provide detailed pricing proposals. This included specifying the minimum discount that they would obtain for Quartz customers through their pharmacy networks for branded and generic drugs in the commercial, health insurance exchange, and Medicare marketplaces across their retail, mail order, and specialty pharmacies.

16. Guaranteeing to secure minimum discount rates is the standard means by which PBMs and insurers determine drug pricing in their service agreements. PBMs negotiate prices and

contract with many individual pharmacies, independent pharmacy groups, and pharmacy chains. Subsequently, PBMs guarantee to secure pricing at a certain aggregate annual discount level for different categories of products. This gives the health plan the certainty on pricing that it requires for establishing member premiums and compliance with applicable laws, while also preserving discretion for the PBM to engage with each pharmacy on an individual basis.

17. Instructions contained in the RFPs made clear that submissions constituted valid and irrevocable offers. MedImpact submitted its proposal on August 12, 2020.

18. With the assistance of PSG, Quartz reviewed the initial proposals and selected several finalists to move into the next phase of the procurement process. In that phase, Quartz sent draft agreements for Commercial and Medicare services to the finalists and invited them to review the agreements on a term-by-term basis and to suggest modifications. Quartz considered each proposed modification to the agreements and responded by either agreeing, rejecting, accepting with qualifications, or agreeing to discuss or negotiate further.

19. MedImpact requested modifications to multiple provisions, and Quartz either accepted or negotiated several of those modifications.

20. At the conclusion of the negotiation process, MedImpact and the other competitor finalist submitted their Best and Final Offers. Quartz's instructions stated that a bidder's submission of a Best and Final Offer reflects its unqualified, affirmative consent to the terms of the agreement as modified through the aforementioned negotiation process.

21. Due to MedImpact's competitive financial guarantees and status as the incumbent PBM, Quartz selected MedImpact and awarded the Agreements, which the parties executed on May 18, 2021. The Agreements became effective on January 1, 2022.

**II.     The 2022 Agreements**

22.     Several terms in the 2022 Agreements are relevant to the present dispute. These include MedImpact's "Financial Guarantees," guardrails on MedImpact's Maximum Allowable Cost ("MAC") Program, procedures for amending or terminating the Agreements, and dispute resolution provisions.

23.     <u>Financial Guarantees</u>:  In the Agreements, MedImpact promised to secure prescription drugs for Quartz's customers at rates representing a minimum discount off the Average Wholesale Price and promised to pay Quartz the difference if it fails to secure the agreed-upon rates.  The specific retail discounted rate that MedImpact promised to achieve depends on the type of drug (i.e., brand or generic), the retail channel network in which it is sold, and the contract year in which it is sold.  MedImpact agreed that unless a specific "Exception Event" occurred, it is bound by the Financial Guarantees in the Agreements and will not try to change the Financial Guarantees due to market fluctuations or otherwise.  The "Exception Events" that allow for a change in the Financial Guarantees are limited to occurrences resulting from adoption of a new law or substantial change in industry practice that result in (1) Average Wholesale Price discounts no longer being available, (2) the pricing methodology employed in the Agreements being rendered obsolete, or (3) rebates being disallowed.

24.     Schedule C of the Agreements lists the agreed-upon "Financial Guarantees" in a series of tables.  The parties agreed that each Financial Guarantee shall be calculated, reported, and paid on a dollar-for-dollar basis, and over-performance of one Financial Guarantee shall not be used to offset under-performance of another.

25.     <u>MAC Program</u>:  The parties agreed that MedImpact shall administer a MAC program whereby it maintains a list of certain widely available generic drugs and imposes a

maximum price that it will allow its network pharmacies to charge for those products (such list referred to as a "MAC List"). Under the Agreements, MedImpact is required to administer a MAC list but retains substantial discretion as to what drugs to include on the list and what prices to set. The only guardrail that Quartz imposed on MedImpact related to the MAC list is a requirement that MedImpact's per unit pricing for dispensing a 90-day drug supply be equal to or lower than its per unit pricing for a 30-day supply of that same medication.

26. <u>Amendment procedure</u>: The parties agreed that the Agreements can be amended or modified and promised to work cooperatively and in good faith to agree on the terms of any amendments. Either party is permitted to propose an amendment and the other party is required to respond within 30 days. However, no amendment is effective unless it is agreed upon and accepted in writing by both parties. While the parties are expected to engage in good faith on a proposed amendment, nothing in the Agreements requires either party to accept an amendment or agree to amend the Agreements if doing so is not in that party's interest.

27. <u>Termination provisions</u>: The Agreements set forth specific circumstances under which either party may terminate the Agreements. Those are limited to circumstances in which a party (1) has a judgment, conviction, or suspension of licensure entered against it, (2) is acquired by another entity, or (3) files for bankruptcy (or a similar process). In addition, MedImpact is permitted to terminate the Agreements if Quartz materially defaults on its payment obligations twice. Termination does not automatically excuse continued performance, however. In recognition of the fact that it takes a long time to secure and integrate a new PBM, the parties agreed that MedImpact will continue certain services even after a termination in accordance with a mutually developed run-out plan.

28. <u>Dispute resolution provisions</u>: The parties agreed that disputes arising under the Agreements would be resolved by binding arbitration before the American Arbitration Association in accordance with that body's Commercial Arbitration Rules. However, they also recognized that breach of certain provisions within the Agreements would cause immediate and irreparable injury, loss, and damage to Quartz, such that immediate injunctive relief in a court of competent jurisdiction may be appropriate and necessary.

### III.   MedImpact's Performance & Threatened Breach

29. On May 5, 2022, several months after MedImpact began performance under the Agreements, it invited Quartz to a meeting to "discuss network performance." At the meeting, MedImpact representatives advised Quartz that MedImpact was struggling to meet the Financial Guarantees set forth in Schedule C of the Agreements and asked if Quartz would consider amending the Agreements' terms.

30. Quartz requested additional information, which MedImpact provided in an email dated May 24, 2022. Despite having proposed—and promised to achieve—the Financial Guarantee rates promised in Schedule C, MedImpact stated that "the new contractual terms are very aggressive and reflect rates that many pharmacies in the network will not accept, which leaves MedImpact bearing the additional burden financially to cover market shortfalls."

31. While MedImpact acknowledged that "there is often risk in financial terms we accept," it complained that the risks are compounded in this case by Quartz's "unique drug, chain and channel mix," "higher penetration of 90 day fills at retail," and "the contractual terms related to MAC management as outlined in the new contract." MedImpact asked Quartz to amend the Agreements to "[a]llow aggregate network performance methodology . . . and eliminate the need for MAC alignment on Retail 30 and Retail 90 channels.

32. In response to MedImpact's assertion that Quartz is an outlier with regard to its network market share with major chains, Quartz noted that "it has had a high market share with major chains for many years and nothing has materially changed with our major market chain market share since the bidding process." Quartz asked, "[w]as Quartz's past market share of major chains not factored into MedImpact's bid?" In response to MedImpact's assertion that Quartz's 90-day penetration had grown, Quartz noted that its 90-day penetration "growth has been nearly linear and very predictable."

33. On June 29, 2022, representatives from Quartz, MedImpact, and PSG met to discuss MedImpact's performance. MedImpact reiterated its concerns about the contractually promised Financial Guarantees, stating that Quartz's actual utilization patterns in 2022 deviate from the historical claims data that was provided with the RFP.

34. Quartz and PSG noted that the utilization changes should not have come as a surprise to MedImpact as they could easily have been predicted from MedImpact's knowledge of the industry, including but not limited to drug trends, as well as MedImpact's historical relationship with Quartz. MedImpact responded that it did not analyze all of Quartz's claims data in its possession, but instead looked only at the data set provided with the RFP and did not add any trend projections.

35. Quartz performed a comprehensive review of the Agreements and conferred regarding MedImpact's anticipated underperformance on the Agreements' Financial Guarantees. Quartz found that MedImpact's faulty projections did not provide a basis to re-open the Agreements and concluded that doing so would result in a substantial financial loss to Quartz. Quartz informed MedImpact that while "[w]e value our relationship with MedImpact, [we] have obligations both to our owners and insureds that dictate we enforce the terms of the contract."

Quartz additionally advised that until MedImpact identified a contractual basis to support its request to re-open the Agreements, no further meeting would be fruitful.

36. On September 12, 2022, MedImpact sent a letter to Quartz enclosing a proposed amendment to the Agreements, threatening to breach the Agreements, and claiming that the Agreements were unconscionable and therefore unenforceable. MedImpact argued alternatively that it should be excused from performance because the Agreements were based on a mistake of fact.

37. Quartz attempted to resolve the dispute without judicial intervention, but was not successful. Quartz subsequently filed this action to preserve the *status quo* pending resolution of the dispute through arbitration.

38. Quartz is in the process of preparing its Request for Arbitration, which will include the counts described herein as well as claims for monetary relief arising out of MedImpact's breach of contract, breach of express warranties, breach of the duty of good faith and fair dealing, fraud in the inducement, tortious interference, and all other applicable causes of action. Quartz has omitted these counts from this Complaint because it is not seeking injunctive relief on these claims and this Court's involvement in the parties' dispute is necessarily limited in light of the parties' agreement to arbitrate.

## COUNT ONE
### Injunctive Relief in Support of Arbitration

39. Quartz incorporates paragraphs 1 through 38 by reference.

40. Under the clear terms of the Agreements, Quartz and MedImpact have agreed to resolve the present dispute through arbitration. Notwithstanding its obligations under the Agreements, MedImpact has threated to breach on December 31, 2022, thereby frustrating the ability of an arbitrator to reach a decision and to grant appropriate relief.

41. Quartz is likely to prevail on the merits during arbitration. MedImpact has identified no legal theory—contractual or otherwise—that would invalidate the Agreements and thereby relieve MedImpact of its duty to perform. The arbitrator is likely to conclude that the Agreements are neither unconscionable nor the product of a mistake of fact excusing MedImpact of its obligations.

42. If an injunction does not issue, Quartz and its customers will be irreparably harmed by MedImpact's threatened breach. Quartz will suffer a loss in consumer goodwill, severe financial hardship, and potential legal liability. Quartz has no adequate remedy at law.

43. While the harm inflicted on Quartz absent an injunction would be significant, an injunction would cause MedImpact little or no harm because MedImpact would merely be required to continue its performance—i.e., the *status quo*—until the conclusion of arbitration. Moreover, a preliminary injunction would be in the public interest.

## COUNT TWO
### Declaratory Relief – The Agreements are Not Unconscionable

44. Quartz incorporates paragraphs 1 through 43 by reference.

45. To be found unenforceable as a result of unconscionability, a contract must be both substantively and procedurally unconscionable. The Agreements between Quartz and MedImpact are neither.

46. MedImpact attempts to claim that the Agreements are unconscionable in their entirety, but it can identify no clause that a court would deem unconscionable—a requirement under Wisconsin law for demonstrating substantive unconscionability. The terms of the Agreements are typical of the industry and therefore are presumptively reasonable.

47. Nor are the Agreements procedurally unconscionable. There was no material disparity in economic strength between the parties, and MedImpact had a meaningful choice as to

whether to accept or reject the terms of the Agreements when the parties negotiated them. MedImpact willingly chose to participate in the competitive bid process that produced the Agreements.

### COUNT THREE
### Declaratory Relief – The Agreements are not Voidable Based on Mistake of Fact

48. Quartz incorporates paragraphs 1 through 47 by reference.

49. To be released from its obligation under the terms of a contract found unenforceable due to mistake of fact, a party must identify a misunderstanding at the time the contract was consummated. MedImpact, however, complains instead of a mistake regarding future expectations, which cannot excuse it from performing.

50. MedImpact's suggestion that faulty data induced it to enter into the Agreements is likewise insufficient grounds to invalidate the Agreements. MedImpact, as the incumbent bidder, provided to PSG, and thus the other bidders, the very data about which it now complains. The Agreements therefore cannot be invalidated based on mistake of fact.

### COUNT FOUR
### Declaratory Relief – MedImpact has no Basis to Terminate or Amend the Agreements

51. Quartz incorporates paragraphs 1 through 50 by reference.

52. Quartz and MedImpact agreed on four bases that allow MedImpact to terminate the Agreements. None of the four bases are met in this case.

53. Furthermore, even if MedImpact had cause to terminate the Agreements, it would still be required to continue performance in accordance with the Agreements' terms.

54. Quartz and MedImpact also agreed on three bases that allow MedImpact to modify its Financial Guarantees. None of the three bases are met in this case.

55. No other contractual provision requires Quartz to accept MedImpact's proposed amendment.

## PRAYER FOR RELIEF

Wherefore, Quartz respectfully requests that the Court:

(a) Issue a preliminary injunction, pursuant to Rule 65 of the Federal Rule of Civil Procedure, (1) to maintain the *status quo*, (2) to prevent MedImpact from breaching its Agreements with Quartz, and (3) to require that MedImpact continue to perform its various duties under the terms of the Agreements. Such relief is requested until either (1) an arbitrator, appointed pursuant to the Commercial Arbitration Rules of the American Arbitration Association, makes a final determination regarding the validity of the Agreements, (2) the existing term of the Agreements expires, or (3) an agreement between Quartz and a replacement PBM becomes effective, whichever date occurs sooner;

(b) Award costs and reasonable attorneys' fees to the extent permitted by law or contract; and

(c) Award Quartz any such other relief as this Court deems just and equitable.

Dated this 7th day of November, 2022.                Respectfully submitted,

Rebecca J. Fiebig (*pro hac vice* forthcoming)   /s/Jamie Stock-Retzloff
Rachel A. Alexander (*pro hac vice* forthcoming)   Jamie Stock-Retzloff
William K. Lane III (*pro hac vice* forthcoming)   Director, Deputy General Counsel, Legal
**Wiley Rein LLP**                                 Services
2050 M Street NW                                   **Quartz Health Solutions, Inc.**
Washington, DC 20036                               2650 Novation Parkway
Phone: 202.719.7000                                Madison, WI 53713
Fax: 202.719.7049                                  608-471-4175
rfiebig@wiley.law                                  Jamie.Stock-Retzloff@quartzbenefit.com
ralexander@wiley.law                               Bar No. 1036418
wlane@wiley.law

*Counsel for Plaintiff Quartz Health Solutions, Inc.*

-14-